15243

PINCKNEY v. AMERICAN WORKMEN

(14 S. E. (2d), 273)

*Messrs. T. A. Houser* and *Brown & Watts,* for appellant,

*Messrs. W. R. Symmes* and *L. Marion Gressette,* for respondent,

April 8, 1941.

The opinion of the Court was delivered by MR. ASSOCIATE JUSTICE STUKES.

This action was commenced by service on December 16, 1938, of summons and complaint in which latter it was alleged that the defendant through one Colter, its agent, solicited the plaintiff to purchase a policy of insurance which was later issued by the defendant and dated September 21, 1936, requiring the payment of a monthly premium of $1.15 on or before the 21st day of each month, which premiums were paid by plaintiff to August 21, 1938, although defendant's records show payment to September 21st and the payment due in August was offered to Colter, who declined to accept it despite plaintiff's insistence; that the agent promised and agreed to, and in fact did, call at plaintiff's home regularly and collected monthly premiums until August, 1938, since which date, although he had been near plaintiff's home, he did not call there and despite plaintiff's repeated offers and those of her husband, continued to refuse to accept the premiums, saying that the policy was lapsed; that plaintiff was sick in bed attended by a physician (within the terms of the policy) in June, 1938, and forwarded a claim for benefits which was returned by the defendant unpaid, and that the policy contained a death benefit to the beneficiary, plaintiff's husband, not to exceed $500.00; that the defendant designed and schemed to cause a lapse of the policy by

the means mentioned and to convert the premiums, that its representations and those of its agent were false, within defendant's knowledge, believed and relied upon by plaintiff and the acts of the defendant were unlawful and for the purpose of cheating plaintiff and her beneficiary of their valuable and vested rights under the policy and to defraud her, to her damage, actual and punitive, in the sum of $2,-999.99.

In the answer the issuance of the policy on September 21, 1936, is admitted, as is the payment by plaintiff of all premiums to September 21, 1938, the filing on June 22, 1938, of a "preliminary sick report," but there were alleged the failure and refusal of plaintiff to execute and submit final proof as required; denial of any act or attempt thereat with the purpose of causing the cancellation of the policy or of any injury or damage to plaintiff; by way of further answer it was alleged that after receipt of plaintiff's claim for sickness on or about June 22, 1938, the blank for final proof was sent to plaintiff, the letter containing the same was returned unclaimed and that on October 25th, the proof blank and letter were returned to the plaintiff with the instruction that it be filled and filed, but the same was never returned to the defendant so the latter was unable to adjust the claim despite its readiness to do so upon the filing of proper proof; that plaintiff was notified to pay the premiums to defendant's agent or to the home office and any injury or damage caused by the lapsing of the policy was by the negligence of plaintiff to pay the premiums and was not caused or contributed to by any acts or omissions of the defendant; further that after the lapse, the defendant several times offered to reinstate the policy, which it is now willing to do, upon payment of the past-due premiums.

At the outset of the trial defendant's counsel requested an "election" by plaintiff as to the cause of action upon which plaintiff would proceed, and counsel for the latter replied "breach of contract with fraudulent intent, accompanied by fraud," by which it was evidently intended by counsel, and

understood by the Court, to mean the usual cause of action for the fraudulent breach of contract accompanied by an act of fraud.

The plaintiff, a colored woman about forty years old, testified that she could not read or write and lived with her husband on the farm of Doctor Raysor about six miles from St. Matthews where the latter had an office and visited the farm occasionally; that Doctor Raysor was her doctor and attended her when she was sick with malaria for two weeks in June, 1938, and filled out the sick report at which time he read the policy to her; that the company's agent, Colter, promised to collect the monthly premiums and did call at her home regularly until September, 1938, at one time when she was sick in bed in June, and that she paid him twenty-four or twenty-five monthly premiums, but that on his last visit to her home in September he declined to accept the monthly premium and told the plaintiff that it had been paid at the head office, he did not know why unless it was on account of her sick claim, but he did not come to her home any more, although he was next door and that he thereafter declined to accept any premiums, and did not come back or give her any further information although he had promised to do so. Plaintiff further testified that she obtained the blank for her claim for sick benefits, which the doctor filled for her, from the agent and that she had received the letter from the defendant dated October 25th, in which was enclosed blank for final proof which she sent back to the defendant, but heard nothing; and also in accord with the request in that letter, she in November gave her premium receipts to the agent who returned them to her, and that she also received the defendant's letter of November 22nd.

The plaintiff's husband, David Pinckney, who was named as death beneficiary, testified that he also could not read; that he "took out" the policy for his wife at their home upon the solicitation of Colter, the agent, whom he paid $2.75

"joining fee" and upon Colter's assurance that he would call for the monthly premiums of $1.15 which he did until September, 1938, when he came next door collecting and the witness tried to pay him the premium, but he said that he could not take it, that the "home office" had paid it, possibly because of the "sick claim" of the insured; that meanwhile the agent had been at his house in June when his wife was sick and collected the premium and, upon the witness' request later returned with a claim blank which was filled by Doctor Raysor and sent to the company without result; that he heard Doctor Raysor read the policy but not the provision that payments should be made to the home office, that Colter said payment should be made to him and after he ceased to come to his home to make collections, the witness turned the matter over to his lawyer; that Doctor Raysor came pretty regularly to the home of the witness and the latter saw him often on Saturdays, that the doctor was a white practicing physician in St. Matthews and well educated; and finally that the witness had known Colter for about two years and depended upon him and relied upon his assurance that the policy was a good one and that he would collect the premiums.

There was no other verbal testimony for the plaintiff, but certain exhibits, a part of her case, are printed in the record as follows:

A. Portions of the policy, that describing the death benefit, $100.00 after the first year, $200.00 after the second and $250.00 after the third, and meanwhile at the rate of $8.33 for each month's dues received; "sick benefit" of $6.00 per week for periods of more than one week in bed and under the care of a physician, doubled in case of hospitalization, halved during the first policy year, etc. Provisions as to payment of premiums, called "dues," appeared on the back of the policy, as follows:

"1-A. If a payment of dues shall not have been made on this policy within the stipulated time provided herein, it

shall thereupon become lapsed and forfeited, but may be reinstated by the Supreme Secretary of the Society and the payment of past due premiums.

"2. Dues paid to an agent, organizer, or collector shall not be considered as having been received by the Society until the remittance for said payments has actually been received at the Home Office. The Society's official receipts for dues are issued from the Home Office only, and no other receipt shall be binding on the Society."

Exhibit "B" consisted of two premium receipt books in plaintiff's possession upon which appeared the following:

"If you do not receive an Official Receipt from the Home Office within two weeks after paying dues, write to the Home Office.

"Always pay your premiums to an authorized collector or to the Home Office. If paid to anyone else you do so at your own risk."

Exhibit "C" was the letter dated June 22, 1938, from defendant to plaintiff which, however, was returned unclaimed to the sender. It acknowledges the receipt of the physician's preliminary report and calls attention to the necessity by him of final proof, form enclosed, after plaintiff's recovery, with assurance that upon receipt it would be referred to "claim investigators for final report and adjustment." By postscript it was stated that before settlement plaintiff must send to the home office all "signed deputy receipts to be checked with this office, as to the payment of dues."

The next Exhibit, "D", is letter from defendant to plaintiff dated November 22, 1938, which acknowledges plaintiff's letter, evidently referring to postal card, Exhibit "H". The letter is in full as follows:

"We have your letter inquiring as to your account, # 282565.

"If you are at this time enjoying A#1 health and can have the enclosed reinstatement health certificate filled out, signed, and returned to this Office with all back dues, we will reinstate your account in full and place policy in force.

"Do not pay any deputy, dues, but send all dues to us direct.

"According to the record you owe us $6.90 back dues which will pay you in full thru November 21, 1938.

"Please reply to this letter promptly."

Although in the record as Exhibit "E", the earlier letter from defendant to plaintiff dated October 25, 1938, of the receipt of which, as of Exhibit "D", there is no question, is as follows:

"We have your letter inquiring as to your account and recent claim.

"On June 22, we wrote you a letter and sick final proof blank was mailed to you, but on July 13, 1938, this letter came back to us unclaimed by you. We cannot understand why the letter was returned. Now we are sending same to you again, together with another final proof blank for you to have executed and return to this Office.

"Also as requested, send to this Office all your signed deputy receipts to be checked with the home office records as to the payment of your dues. It is necessary that dues be paid to date before making a claim.

"We trust to hear from you at once."

Exhibit "F" is document which the plaintiff testified may or may not have been attached to the original policy as follows: "Your first assessment will be due and payable to this office one month from the date of your certificate. A notice of same, together with a return envelope, will be sent to you five days before it is due, and upon receipt of the notice you should immediately forward the amount necessary to carry your certificate. All payments should be made by post office or express money order, registered letter or certified check. If you prefer to do so, you may pay your dues to authorized collectors, who will remit same to the Home Office for you."

Exhibit "G" is "sick blank" which included Dr. Raysor's certificate of visit on June 7, diagnosis of acute ma-

laria and estimate of confinement to bed of "week or more," and was sent to and received by defendant, dated June 18. 1938.

Exhibit "H". Postal card from plaintiff to defendant, postmarked St. Matthews, S. C., November 17, 1938.

"St. Matthews, S. C., Nov.—16, 1938

"Gentlemen: My name is Selena Pinckney and my policy is No—282565 and it pays 1.15 a month on 21st. each month—and I wants to know what month my policy is paid to, What is last month you has me paid for—I lost some of my receipts and I don't know how many times you has me paid for—Let me here from you soon—As I got a good policy now—(Signed) Selena Pinckney."

At the conclusion of plaintiff's testimony the defendant moved for a nonsuit on the four grounds stated in the record as follows:

"1. That the plaintiff has made out no cause of action; they have not proven the breach of any contract and they have not proved that they complied with the terms and conditions of the policy;

"2. The evidence shows conclusively that the plaintiff has the means and manner to ascertain the contents of this policy, that she did have the policy read to her in June of 1938, at the time the sick blank was filled out;

"3. The evidence further shows that any damage done to the plaintiff was brought about by her own contributory negligence, which negligence contributed to the damage, if any, that she sustained;

"4. That she had these receipts read to her by Dr. Raysor; she could have paid the home office in Washington. The receipts indicated that (Mr. Watts reads from receipts). The plaintiff claims or alleges that she was sick in June and that the company did not attempt to collect any premium until August. As a matter of fact, they went so far as to send her blanks. I can't see where they tried to cancel out the policy because she was sick."

The motion was overruled and defendant's testimony was introduced consisting of a deposition which is printed without the preliminary questions and answers, but was evidently by an officer of the defendant insurance company in its home office and is to the effect, in important substance, that plaintiff was issued a policy on September 21, 1936, and filed a physician's notice of sickness in June, 1938, whereupon she was written the letter of instructions of June 22nd, enclosing a final proof blank, which latter has never been completed and filed although another form was sent to the plaintiff on October 25, 1938; that the company has been willing to pay the claim of plaintiff when properly proven, that the latter is not now "a member of the American Workmen because her policy lapsed for non-payment of monthly premium in September, 1938," since which time she has been advised several times to reinstate the policy, which offers she has not accepted, but they still stand open, and that from time to time plaintiff was notified when her monthly dues were payable and was furnished with return envelopes to mail them direct to the home office.

Thereafter plaintiff placed in evidence the mortuary table or statute.

Defendant moved for a directed verdict in the following language from the record:

"Mr. Watts: Your Honor, we move for a directed verdict for both actual and punitive damages in favor of the defendant upon the same grounds as mentioned in our motion for a nonsuit, and that they have made out no breach of contract, breach of contract with a fraudulent intent or fraudulent act. No fraudulent act alleged.

"As to punitive damages, make the motion on the same grounds as to actual damages, that there is no fraud or intent; that the only reasonable inference to be drawn from all of the testimony in the case is that they wanted to collect the premiums and wanted to continue the policy in force, or

if they refused to accept a premium there is no showing that that was any fraudulent intent.

"The Court: You mean fraudulent intent or fraudulent act?

"Mr. Watts: No fraudulent intent or act.

\* \* \*

"Mr. Watts: Your Honor, we move for a directed verdict as to actual damages on the ground that no damages have been alleged or proved. There has been no proof that she was damaged by the cancellation of the policy.

"Further; the plaintiff has not exhausted her remedy under the policy with reference to her right of reinstatement. She has not shown that she tried to be reinstated.

"That if she was damaged it was was caused by or contributed to by her own contributory negligence in not paying the dues to the home office in the manner provided in the policy.

"The Court: Can you plead contributory negligence in an actionable contract?

"Mr. Watts: Either that or the failure on her part to live up to her contract. She could have paid those dues to the home office as the policy told her to.

"Further; the evidence shows that the policy was not lapsed in September when she claims it was lapsed, whether it was paid by the company for her or whether they passed over that monthly payment and allowed the policy to continue, that is immaterial as long as they are in force. She alleges that it was paid and that it was in force.

"As to punitive damages. There is no evidence of fraud. The only reasonable conclusion to be drawn from the testimony is that upon the lapse of the policy, at most, it was just a negligent lapse. There is no evidence showing any intent or any purpose to cancel.

\* \* \*

"Mr. Watts: All of the evidence shows, the answer shows and the depositions show that they did everything they could to help her to get this policy reinstated."

The Court overruled the motions and submitted the questions of actual and punitive damages to the jury who returned a verdict of $50.00 actual and $300.00 punitive damages and from the judgment thereon this appeal was taken.

There are numerous exceptions which the appellant has grouped and argued under several questions but in the view we take it is not necessary to discuss either seriatim; all exceptions have been considered. Upon careful study of the record we think that the Court erred in refusing to direct a verdict for the defendant upon the issue of punitive damages. In other words, we are of the opinion that the evidence, which is set forth rather fully above, is not susceptible of a reasonable inference that the defendant was guilty of a fraudulent breach of the insurance contract accompanied by a fraudulent act.

In the brief of respondent certain cases from this Court are cited and relied on, but upon consideration we find that none of them justifies submission to a jury of the issue of punitive damages upon the facts in evidence in this case. They will be discussed in the order in which they appear in the brief.

In *Wilkes et al. v. Carolina Life Insurance Co.,* 166 S. C., 475, 165 S. E., 188, a demurrer to the complaint was overruled but there it was alleged that there was a dispute as to the period for which the premiums upon the policy had been paid and the agent refused to accept a premium which he contended was subsequent to that which he was attempting to collect, left plaintiff's home in anger, conceived the purpose to bring about the cancellation of the policy in fraud of the plaintiff, and shortly thereafter another agent of the company representing the district manager in another city informed plaintiff that the former collector and district manager would accept no more premiums even if sent to his office and that he would have the home office lapse the policy, which latter action plaintiff was informed had been taken by the home office according to the statement of the district manager; and this Court concluded that a cause of action for

fraud was stated in the complaint because of the underlying allegation that it was the purpose of defendant's agent to force a lapse by refusing to collect or accept any more premiums. In this case we have some evidence of the latter but with it uncontradicted evidence that the home office of the defendant was ready and willing to accept the premiums and similarly disposed toward the payment of plaintiff's disability claim upon receipt of final proof of the latter.

Next cited is *Mack v. Life & Casualty Insurance Co.,* 171 S. C., 350, 172 S. E., 305, in which a verdict for actual and punitive damages was sustained. The reference in the decision to the testimony is brief but it includes the fact that plaintiff's evidence tended to show that she had not been given credit for the payment of some premiums and that some were refused at the office of the company which were tendered when the policy was still in force, all of which made an issue for the jury upon the charge of fraud.

Erroneously cited in the brief as being contained in the 187th volume of our reports is the case of *Riley v. Life & Casualty Insurance Co.,* 184 S. C., 383, 192 S. E., 394. A verdict for actual and punitive damages was upheld but it was stated in the opinion that the agent ceased to call for the premiums when plaintiff's health began to fail and when he undertook to pay his premiums he learned of the lapse of the policy and tender of the premiums was refused, defendant's district manager stating that he had stopped the agent from collecting because of plaintiff's bad health and uninsurability. There was no evidence in the present case that the plaintiff was or is not insurable, her disability of two weeks in June having been shown to be acute malaria and her age far from old.

On the other hand, we think the recent authority of *King v. North Carolina Mutual Life Insurance Co.,* 194 S. C., 367, 9 S. E. (2d), 788, and the cases therein cited, are applicable and controlling and like that case this should have been submitted to the jury upon the issue of actual damages only. See also *Pack v. Metropolitan Life Insurance Co.,* 178

S. C., 272, 182 S. E., 747, and *Calder v. Commercial Cas. Ins. Co.,* 182 S. C., 240, 188 S. E., 864.

There was evidence of the failure and refusal of defendant's agent to call for and receive the monthly premiums in violation of his promise so to do which would justify the award of actual damages for the alleged resulting loss of the policy despite the defendant's apparent readiness and willingness to receive the premiums at its home office, particularly in view of the provisions in the policy, the receipt books and Exhibit "F" contemplating alternative payment of the premiums to an agent or collector; at least an issue was made thereabout for the jury.

In this connection appellant complains of the instructions to the jury with regard to the measure of actual damages and the refusal of the Court to charge that only nominal damages were recoverable. The charge was as follows:

" * * * actual damages would be such premiums as were paid by the insured between the time the policy was originally issued and the time that the contract was broken, if you find it was broken, less the value of the protection that the insured had during the time the policy was in force, plus any damage that the plaintiff may have suffered as a result of the breaking of the insurance contract or the lapsing of the policy, as it is generally called. That damage would be the difference in premiums, in the amount of premiums that one would have to pay to take out insurance at an older age in life, the difference between the premium at the time she took out the original policy and the premiums she would have to pay out at a later age if she could take out other insurance. Sometimes an element of damages is the inability to secure other insurance, but I charge you that you can't consider that in this case, because there is no evidence that this insured might not be able to obtain insurance in some other company, therefore you can't award plaintiff any damages because of her inability to procure other insurance in the place of the one she originally had.

"The element of damages where it has been proved that the contract was broken or breached by the defendant insurance company would not only include premiums, less the value of the protection during the time the policy was in force, but it would also be the difference between the original premium and the premium that one would have to pay at another age, at a later time, for other insurance.

"And in this particular case as I recall the testimony it is undisputed that the age of the insured was stated in the policy at 38.

"Mr. Symmes: Yes, sir; thirty-eight in the policy.

"The Court: It is also undisputed that the policy was in force for about two years when it was lapsed, so that she would have been forty years of age at the time of the lapsation of the policy, and under the expectancy table she would be expected to live 28-18/100 years longer."

"The Court: There are no special damages.

"Mr. Watts: No allegation or evidence of special damages.

"The Court: That would be the measure of actual damages in case you conclude that the plaintiff is entitled to recover actual damages, if she has satisfied you that the policy was breached or broken by the defendant, wrongfully."

This instruction was, we think, suited to the evidence in this case and was, therefore, in conformity with the authority of *Rogers v. Jefferson Standard Life Insurance Co.,* 182 S. C., 51, 188 S. E., 432; indeed it was more favorable to the defendant than the rule there applied, and properly so because of the lack of evidence in this case that the plaintiff could not again procure insurance similar to that lapsed. See also *Pack v. Metropolitan Life Insurance Co., supra.* Furthermore, it was more favorable to the insurer than the rule of the *Rogers case* in that it required the offset of the value of the protection afforded by the lapsed policy.

For the reasons indicated the judgment of the Circuit Court is affirmed as to actual damages and reversed as to punitive damages.

Mr. Chief Justice Bonham, Messrs. Justices Baker and Fishburne and Mr. Acting Associate Justice L. D. Lide concur.